| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |

| | |
|---|---|
| LONNIE WHITESIDE, | § |
| | § |
| Plaintiff, | § |
| | § |
| *versus* | § CIVIL ACTION NO. 1:11-CV-154 |
| | § |
| UNITED STATES OF AMERICA, | § |
| | § |
| Defendant, Third-Party Plaintiff, | § |
| | § |
| *versus* | § |
| | § |
| P.C. PFEIFFER COMPANY, INC., | § |
| | § |
| Third-Party Defendant. | § |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant the United States of America's (the "United States") Motion for Summary Judgment (#50), in which it seeks judgment as a matter of law on Lonnie Whiteside's ("Whiteside") negligence claim. Having considered the pending motion, the pleadings, and the applicable law, the court is of the opinion that the United States' motion should be granted.

I.    Background

Whiteside is a commercial trucker formerly employed by Ace Transportation ("Ace"). He was sent by Ace to transport a Humvee and a forklift from the Port of Beaumont (the "Port") to a United States Army (the "Army") depot in Pennsylvania. He arrived at the Port to pick up the cargo on April 2, 2009. After his credentials were confirmed, he was escorted into the Port's loading area, where the Humvee and forklift had been taken off a ship and parked by employees of Pfeiffer. Whiteside parked his truck and walked to a waiting area to watch as Pfeiffer

employees loaded the vehicles onto his flatbed trailer. To do so, Pfeiffer employees separately loaded each vehicle utilizing two forklifts: one elevated the vehicle on its forks while the other, for safety reasons, positioned its forks directly beneath those of the forklift bearing the vehicle in question. During this operation, two civilian employees of the Army were present. They confirmed that the correct equipment was loaded onto the truck and guided the Pfeiffer employees who were loading the cargo. They did not, however, perform any of the actual physical loading of either the Humvee or the forklift. Once Pfeiffer had positioned the vehicles on the trailer, Whiteside was permitted to return to his truck and begin securing his load. He used chains and other tie-downs to ensure that the vehicles were safely attached to the trailer. After completing this task, Whiteside drove his tractor-trailer to Orange, Texas.

Whiteside did not begin his journey to Pennsylvania until April 6, 2009. That morning, he left Orange early but was stopped at a weigh station just inside the Louisiana border because his rig was overloaded. As a result, he returned to the Port, where Pfeiffer employees reversed the direction of the forklift to balance his load better. Army personnel were present but again did not perform any actual loading. Afterward, he had no trouble with the cargo until later that evening. During the eight-to-nine-hour journey, he stopped two or three times to re-tighten the tie-downs on the cargo.

Sometime after 8:00 p.m., as Whiteside rounded a curve on Interstate 59 in Alabama, the forklift fell off the flatbed. During the fall, the forks of the forklift caught the trailer's rear tandem axles, causing the truck to lift momentarily off the highway and then crash-land on its passenger side. Whiteside's truck and trailer skidded along the Interstate, covering nearly the distance of

2

a football field before stopping. The Humvee, however, remained secured to the flatbed throughout the entire ordeal. Whiteside sustained injuries as a result of the accident.

Whiteside stayed in a motel the night of the accident. Meanwhile, his truck and the forklift were towed to a nearby vehicle yard. The next morning, he went to the yard to examine the vehicles. He was particularly interested in viewing the forklift because his friend, Nelson Jurecka ("Jurecka"), had advised him over the telephone that the accident may have been caused by the failure to engage the forklift's parking brake before loading it. Whiteside alleges that, although the forklift was severely damaged during the wreck, the forklift's parking brake was not engaged.

Whiteside later sued Pfeiffer and the United States for negligence in causing the accident that led to his injuries. He seeks damages for physical pain, mental anguish, loss of earning capacity, disfigurement, physical impairment, and medical expenses. The court later dismissed Whiteside's claim against Pfeiffer because it was time-barred, and Pfeiffer was dismissed as a party to this action. Pfeiffer was brought back into this suit, however, after Whiteside filed an unopposed motion to compel the United States to add Pfeiffer as a responsible third party. In response to Whiteside's motion, the United States filed a third-party complaint against Pfeiffer asserting its rights to indemnity or contribution pursuant to § 33.016 of the Texas Civil Practice and Remedies Code.

Whiteside and Pfeiffer eventually settled, and the court granted summary judgment in favor of Pfeiffer on the United States' contribution claims. *See* Docket No. 55. The only remaining cause of action in this suit is Whiteside's negligence claim against the United States, which is based on the United States' alleged failure to engage the parking brake on the forklift. On February 27, 2013, the United States filed the instant motion for summary judgment, arguing

that Whiteside's claim fails because it owed no duty to him. Whiteside responded to the motion on March 11, 2013. On March 21, 2013, the United States filed a reply as well as a motion to strike, claiming that an affidavit from Jurecka, on which Whiteside partially relies, is not proper summary judgment evidence.[1]

II.     Analysis

    A.     Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

"A fact is material only if its resolution would affect the outcome of the action . . . ." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); accord *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue is '*genuine*'

---

[1] Because the court's decision does not depend on the contents of Jurecka's affidavit, the United States' Motion to Strike is denied as moot.

if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Poole*, 691 F.3d at 627; *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Wiley*, 585 F.3d at 210; *EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454. The moving party, however, need not negate the elements of the nonmovant's case. *See Bayle*, 615 F.3d at 355; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 339 (5th Cir. 2004).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Bayle*, 615 F.3d at 355; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Downhole Navigator, LLC v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th

Cir. 2012); *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009); *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith ex rel. Estate of Smith*, 391 F.3d at 624. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Groh v. Ramirez*, 540 U.S. 551, 562 (2004) (citing *Anderson*, 477 U.S. at 255); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 192 (5th Cir. 2011); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009).

Furthermore, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co.*, 504 U.S. at 468-69; *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss.), *aff'd*, 293 F. App'x 273 (5th Cir. 2008). The nonmovant's burden is not satisfied by "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,'" by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)); *accord Thibodeaux v. Vamos Oil & Gas Co.*, 487 F.3d 288, 294-95 (5th Cir. 2007); *Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not

sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *accord RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002); *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 332 (5th Cir. 2004).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

B.  Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA"), subject to various exceptions, operates as a waiver of the United States' sovereign immunity for tort claims. *See* 28 U.S.C. §§ 2671-2680 (2006); *Levin v. United States*, ___ U.S. ___, 133 S. Ct. 1224, 1227 (2013); *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 252 (5th Cir. 2006); *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000). "The FTCA imposes liability upon the United States for the tortious conduct of its employees, when acting within the course and scope of their employment, in the same

7

manner and to the same extent as a private individual under like circumstances." *Hebert v. United States*, 438 F.3d 483, 486 (5th Cir. 2006) (citing 28 U.S.C. §§ 1346, 2674). Congress enacted the statute to prevent injustice to those having meritorious claims that sovereign immunity would otherwise bar and to eliminate the burden on Congress of investigating claims for relief. *See United States v. Muniz*, 374 U.S. 150, 154 (1963).

The FTCA allows federal courts to exercise jurisdiction over claims brought against the United States for property damage, personal injury, or death caused by the negligent or wrongful acts or omissions of federal employees while acting in the scope of their employment if a private person would be liable to the claimant under comparable circumstances. *See* 28 U.S.C. § 1346(b); *Peacock v. United States*, 597 F.3d 654, 659 (5th Cir. 2010). The extent of the United States' liability under the FTCA is generally determined by reference to the law of the state "'where the act or omission occurred.'" *Crider v. United States*, 885 F.2d 294, 295 (5th Cir. 1989) (quoting 28 U.S.C. § 1346(b)); *accord Ellis v. United States*, 673 F.3d 367, 372 (5th Cir. 2012). If the substantive law of the state in which the misconduct occurred would not permit recovery, the United States will not be liable under the FTCA for its employees' misconduct. *See Carlson v. Green*, 446 U.S. 14, 23 (1980); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Mississippi Plaintiffs)*, 668 F.3d 281, 287-88 (5th Cir. 2012).

   C. <u>Negligence</u>

Under Texas law, a negligence claim consists of four essential elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty; (3) an actual injury to the plaintiff; and (4) a showing that the breach was the proximate cause of the injury. *See Espinoza v. Cargill Meat Solutions Corp.*, 622 F.3d 432, 443 (5th Cir. 2010); *Boudreaux*, 402 F.3d at 540-

8

41; *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 663 (Tex. 1999).

"Whether a legal duty exists is a threshold question of law for the court to decide from the facts surrounding the occurrence in question." *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999) (citing *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex. 1994)); *see Boudreaux*, 402 F.3d at 541. If the defendant owed no duty, it cannot be found liable for negligence. *See Boudreaux*, 402 F.3d at 542 n.19; *Thapar*, 994 S.W.2d at 637 (citing *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex.), *cert. denied*, 525 U.S. 1019 (1998)).

"A duty is a legally enforceable obligation to conform to a particular standard of conduct." *San Benito Bank & Trust Co. v. Landair Travels*, 31 S.W.3d 312, 317 (Tex. App.—Corpus Christi 2000, no pet.); *accord City of Houston v. Jenkins*, 363 S.W.3d 808, 817 (Tex. App.—Houston [14th Dist.] 2012, pet. filed). In assessing the existence of a duty, the court considers "'several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.'" *Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 544 (Tex. 1998) (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); *accord Boudreaux*, 402 F.3d at 541 n.16. Of these factors, foreseeability of the risk is the dominant consideration. *Boudreaux*, 402 F.3d at 541; *Greater Houston Transp. Co.*, 801 S.W.2d at 525.

1. <u>Duty of Shipper</u>

Here, the United States argues that it owed no duty to Whiteside to secure the parking brake on the forklift under Texas law. The transportation of cargo must be done with "care, skill,

caution and dispatch—not carelessly or negligently." *Panhandle Gravel Co. v. Wilson*, 248 S.W.2d 779, 782 (Tex. Civ. App.—Amarillo 1952, writ ref'd n.r.e.); *see also Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (stating that Texas law recognizes a duty to use reasonable care when one undertakes to provide services to another, whether gratuitously or for compensation). This basic requirement is satisfied by ensuring that cargo on a truck or trailer is securely loaded. *See, e.g.*, *Tex. Specialty Trailers, Inc. v. Jackson & Simmen Drilling* Co., No. 2-07-228-CV, 2009 WL 2462530, at *7 (Tex. App.—Fort Worth 2009, pet. denied); *Thomas v. Richard*, 624 So. 2d 962, 966 (La. Ct. App. 1993); *Hicklin v. Jeff Hunt Mach. Co.*, 85 S.E.2d 739, 743 (S.C. 1955).

The predominant view regarding the duty of care in loading cargo was discussed at length in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953), *cert. denied*, 347 U.S. 952 (1954). The *Savage* court summarized the rule concerning the proper allocation of duty as between the shipper and the carrier, as follows:

> The primary duty as to the safe loading of property is . . . upon the carrier. When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

*Id*.

"The policy behind the *Savage* rule is well founded." *Decker v. New England Pub. Warehouse, Inc.*, 749 A.2d 762, 766 (Me. 2000). Indeed, the rationale embodied in the *Savage* rule is followed by a majority of jurisdictions. *Id.* at 767; *see, e.g.*, *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 848-49 (8th Cir. 2010) (following the *Savage* rule); *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 220 (3d Cir. 2010) (same); *Rector v. Gen. Motors Corp.*, 963

10

F.2d 144, 146-47 (6th Cir. 1992) (holding that carriers, not shippers, normally have the responsibility to load cargo in a safe manner); *Ala. & V. Ry. Co. v. Am. Cotton Oil Co.*, 249 F. 308, 311 (5th Cir. 1918) (using the same rationale later adopted by the *Savage* court); *see also Armour Research Found. of Ill. Inst. of Tech. v. Chicago, Rock Island & Pac. R.R. Co.*, 297 F.2d 176, 178 (7th Cir. 1961); *Morris v. Ford Motor Co.*, No. 2:10cv504, 2012 WL 5947753, at *12-13 (N.D. Ind. Nov. 28, 2012); *Ebasco Servs., Inc. v. Pac. Intermountain Express Co.*, 398 F. Supp. 565, 568 (S.D.N.Y. 1975); *Smart v. Am. Welding & Tank Co.*, 826 A.2d 570, 573 (N.H. 2003); *Tex. Specialty Trailers*, 2009 WL 2462530, at *7 (relying on the *Savage* rule); *Brashear v. Liebert Corp.*, No. 06AP-252, 2007 WL 184888, at *3 (Ohio Ct. App. Jan. 25, 2007).

Therefore, "[t]he federal courts have held that if a shipper assumes the responsibility for loading its property onto a motor vehicle it has the duty to exercise reasonable care in properly securing the load." *Brashear*, 2007 WL 184888, at *3; *see Pierce v. Cub Cadet Corp.*, No. 87-5936, 1989 WL 47446, at *4 (6th Cir. May 9, 1989); *Tex. Specialty Trailers*, 2009 WL 2462530, at *7. Specifically, shippers who undertake to load trucks on their premises are under a common law duty "'to load the trucks in such a manner that they [are] not overloaded and the load [is] secure.'" *Mavrikidis v. Petullo*, 707 A.2d 977, 992 (N.J. 1998) (quoting *DeBonis v. Orange Quarry Co.*, 558 A.2d 474, 479 (N.J. Super. Ct. App. Div. 1989)); *cf. Panhandle Gravel Co.*, 248 S.W.2d at 782 (stating that a gravel company violated a contractual duty to level gravel properly during the loading process). Thus, shippers who improperly load cargo may be held liable for injuries caused by their negligence if the defective loading is not evident upon reasonable inspection. *See Decker*, 749 A.2d at 767.

Generally, when the shipper assumes this responsibility, it becomes liable for latent or concealed defects, while the carrier bears responsibility for improper loading that is obvious. *Savage Truck Line, Inc.*, 209 F.2d at 445; *Decker*, 749 A.2d at 767; *Smart*, 826 A.2d at 573. Similarly, shippers who falsely assure a carrier that the cargo is firmly in place may be liable for injuries caused by their negligence. *See Franklin Stainless Corp. v. Marlo Transp. Corp.*, 748 F.2d 865, 868-70 (4th Cir. 1984) (recognizing that false assurances of safety to a carrier may lead to a shipper's liability); *Grantham v. Nucor Corp.*, No. 2:07-CV-229, 2008 WL 3925211, at *3 (D. Utah Aug. 20, 2008) (denying summary judgment where truck driver noticed problems with load but was told by defendant's employee that the employee "knew what he was doing"). Nevertheless, a shipper will not ordinarily be liable unless it retained exclusive control over loading the cargo. *See Rector*, 963 F.2d at 147.

### 2. Duty of Carrier

With respect to a carrier, the driver has a duty to "make reasonable inspection to see that the load [is] properly distributed and . . . secured," and if a driver exercising ordinary care knew or should have known that the cargo to be carried was improperly loaded, then he is said to have assumed the risk of potential danger to third parties. *Jenkins v. E. L. Long Motor Lines, Inc.*, 103 S.E.2d 523, 528 (S.C. 1958); *accord Hicklin*, 85 S.E.2d at 743; *see also Rector*, 963 F.2d at 146 (observing that the carrier is primarily responsible for ensuring the security of the cargo). Thus, an obvious defect in loading creates a duty on the part of the carrier to remedy the improper loading or warn others who may be affected. *See Spence*, 623 F.3d at 220; *Sprague v. Louis Picciano, Inc.*, 100 A.D.2d 247, 251 (N.Y. App. Div. 1984); *see Fluor Eng'rs & Constructors, Inc. v. S. Pac. Transp. Co.*, 753 F.2d 444, 453 (5th Cir. 1985) ("In all cases where the shipper

12

has been shown to have negligently loaded his shipment, the carrier's duty to discover the problem is the same: it is limited to discovery of defects that are patent or apparent upon reasonable inspection."). The carrier, therefore, bears the primary duty to see that cargo is loaded safely. *Savage Truck Line, Inc.*, 209 F.2d at 445; *accord Spence*, 623 F.3d at 220; *Rector*, 963 F.2d at 146; *Franklin Stainless Corp.*, 748 F.2d at 868; *Johnston v. Sappi Fine Paper N. Am.*, No. 06-11617, 2007 WL 1011914, at *3 (E.D. Mich. Mar. 29, 2007).

Federal law is in accord with this rationale. For example, federal regulations impose a nondelegable duty upon a carrier to secure all loads safely. *See* 49 C.F.R. § 392.9; *see also Rector*, 963 F.2d at 147. In particular, a carrier or driver must ensure that his "vehicle's cargo is properly distributed and adequately secured." 49 C.F.R. § 392.9(a)(1). Moreover, a shipper cannot force a carrier to haul an unsafe load. *Decker*, 749 A.2d at 766; *see* 49 C.F.R. § 392.9(a). Therefore, a carrier is required to take steps to prevent or protect cargo from shifting or falling. *See id.* §§ 393.100-393.136. As the Sixth Circuit has observed, these federal regulations, while not dispositive, are "'indicative of the proper allocation of duty as between a common carrier and a shipper for the proper loading of goods.'" *Johnston*, 2007 WL 1011914, at *3 (quoting *Rector*, 963 F.2d at 147). Indeed, the nature of the trucking industry suggests that carriers "should have the final responsibility for the loads they haul" because no shipper can force a carrier to accept an unsafe load. *Decker*, 749 A.2d at 766; *see* 49 C.F.R. § 392.9(a).

### 3. Duty of United States

The United States rests its argument on the *Savage* rule, contending that it had no duty to secure the parking brake because Pfeiffer was fully responsible for loading the cargo and Whiteside had a duty to secure it to his trailer. While agreeing that he was responsible for

13

securing his load, Whiteside argues that § 414 of the Restatement (Second) of Torts applies to impose a legal duty on the United States. *See Elliot-Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 803-04 (Tex. 1999). Section 414 states the following:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965). According to Whiteside, the United States is analogous to one who entrusts work to an independent contractor because it controlled the forklift and, therefore, was in the best position to ensure that its braking system was engaged before turning it over to Pfeiffer for loading.

The court finds Whiteside's argument lacking. There is no material dispute that the United States, as shipper of the forklift, did not assume responsibility for loading the forklift. Rather, the forklift was loaded at the Port by Pfeiffer employees. The Port's tariff regulation 225(A) states that "service of loading/unloading cargo to/from railcars and trucks will be performed by the Port Authority or its authorized contractors." At the time of Whiteside's accident, the Port had contracted with Pfeiffer to perform unloading operations, as evidenced by the Loading/Unloading Agreement submitted by the United States in support of the instant motion. Indeed, Whiteside's testimony demonstrates that the actual physical loading of the cargo was performed by Pfeiffer:

> Q. . . . it was actually a PC Pfeiffer employee who loaded the equipment onto your truck with the forklift.
>
> A. Sure.
>
> Q. Is that right?
>
> A. Yes, ma'am; but the equipment belonged to the Army.

14

> Q. Okay. The equipment belonged to the Army?
>
> A. Yes, ma'am.
>
> Q. The physical loading, would you agree, was done by a Pfeiffer employee?
>
> A. Yes, ma'am.

At most, the evidence establishes that some civilian employees of the Army told Pfeiffer what to load and in some manner "guided" the equipment used by Pfeiffer employees to place the cargo onto the trailer:

> Q. . . . Is there anybody else involved in the loading of the cargo?
>
> A. You just had the—the Army personnel that was just standing by, and they would guide the forklift to—to go one way or the other.
>
> Q. Okay. So, they're telling the forklift driver which way to go?
>
> A. As a guide, yes, ma'am.
>
> Q. Okay. Did you see the Army personnel do anything else with the loading of the cargo?
>
> A. No, ma'am.

Whiteside Dep. 44:13-23, Nov. 9, 2011.

\* \* \*

> Q. [The United States has] stated that they're not responsible for ensuring the security of the load and they exercise no control over the loading of the equipment. Do you believe that statement?
>
> A. No.
>
> Q. And why not?
>
> A. Because they tell us what to load. They just don't tell us where to load it all the time.

15

Joseph E. Donofry[2] Dep. 19:18–20:2, Nov. 9, 2011.

Nonetheless, Whiteside conceded that he understood that he alone had a duty to secure his cargo properly and that employees of the United States played no part in securing his load:

> Q. Did anyone with the military assist you with securing either the forklift or the humvee to your trailer?
>
> A. No, ma'am.
>
> Q. And you understood on April 2nd, 2009, that it was your job, as the driver, to secure the cargo to the trailer?
>
> A. Yes, ma'am.

Moreover, Kenneth Pendergraft, the Army's Chief of Operations at the Port, testified that it was Pfeiffer, not the United States, that had an opportunity to engage the parking brake:

> Q. And if anybody would have had an opportunity to engage a parking brake on that forklift, it would have been the U.S. military; correct?
>
> A. No.
>
> Q. Who would it have been?
>
> A. It would have been union labor that took it off of the ship and parked it in its first place of rest.

The evidence is insufficient to show either that the United States undertook the responsibility for loading the cargo or that Pfeiffer was an independent contractor of the United States. *Tex. Specialty Trailers*, 2009 WL 2462530, at *8 (holding that assisting in loading a rig, without more, is insufficient to impose upon defendants the duty to ensure the safe and secure loading of the rig). Rather, the physical loading of the forklift was performed by Pfeiffer in accordance with both Port regulations and the contract between the Port and Pfeiffer. Pfeiffer

---

[2] Donofry is a warehouse superintendent for Pfeiffer.

employees unloaded the forklift from the ship and parked it on the dock.  Army employees merely told Pfeiffer employees what to load and pointed out to Pfeiffer's employees which way to direct the two forklifts they used in loading the cargo.  The evidence also fails to show that Army personnel were involved in any significant manner with the readjustment of the forklift that took place on April 6, 2009.  Because the United States was never responsible for loading the forklift, it cannot be faulted for failing to set the parking brake.  Thus, under the *Savage* rule, the United States, as the shipper, owed no duty to Whiteside to engage the parking brake on the forklift when it was loaded onto his trailer.

Because the court finds that the United States owed no duty to Whiteside, his claim for negligence fails as a matter of law.

III.  Conclusion

Accordingly, the United States' Motion for Summary Judgment is GRANTED.  Whiteside presents no claims that merit relief.  There remain no material facts in dispute, and the United States is entitled to judgment as a matter of law.

SIGNED at Beaumont, Texas, this 28th day of May, 2013.

*Marcia A. Crone*
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE